IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

| | | |
|---|---|---|
| CURTIS DAVIS, | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| v. | ) | CIVIL ACTION NO. 5:12-CV-92(MTT) |
| | ) | |
| PRODUCERS AGRICULTURAL | ) | |
| INSURANCE COMPANY, | ) | |
| | ) | |
| **Respondent.** | ) | |
| | ) | |

## ORDER

This matter is before the Court on the Movant's Amended Motion to Vacate Arbitration Award (Doc. 3) and Motion for Summary Judgment (Doc. 6).  For the following reasons, the Movant's Motions are **GRANTED**.

## I.  FACTUAL BACKGROUND

Movant Curtis Davis is a farmer who resides in Bleckley County, Georgia.  Davis purchased a crop insurance policy from Respondent Producers Agricultural Insurance Company ("ProAg") to insure his cotton crop produced in 2008 in Pulaski County, Georgia.  (Doc. 4 at 2).  During 2008, Davis allegedly experienced a significant reduction in his cotton crop quality and yield caused by periods of drought and excessive rainfall.  (Doc. 4 at 3-4).  Davis began harvesting his crop in October 2008 and completed the harvest on December 24, 2008.  Several days before completion of the harvest, Davis notified his crop insurance agent, Pat Rush of the Rush-Yearty Insurance Agency, on December 22 of possible yield loss to his crop pursuant to Sections 15(a)(2) and 15(g) of his policy.  (Docs. 3-1 at 15-16; 4 at 4).  The policy allows

this notice to be given to the agents.  (Doc. 14-2 at 16).  However, Jan Yearty of the

same agency failed to forward the notice of loss to ProAg until January 8, 2009.[1]  (Doc.

4 at 4).

Section 15 of the policy also required Davis to provide notice of his expected

revenue loss within 45 days after the date of release of the harvest price and submit a

claim for indemnity declaring the amount of loss, including all information "[ProAg

required] to settle the claim," within 60 days of the harvest price's release.  (Doc. 3-1 at

15).  The harvest price for cotton was released on December 10, 2008.  (Doc. 4 at 4).

Davis alleges that he timely complied with all requirements under the policy.

What actually occurred in the period between the time Davis submitted his initial

notice of loss on December 22, 2008, and when ProAg first notified him on June 12,

2009, that his claim was untimely is unclear.  ProAg claims that during that time period,

Davis "failed to provide his local agent or ProAg with any of the documentation required

under Section 15 of the policy."  (Doc. 10 at 4).  It is apparent from the arbitration

record, however, that ProAg was adjusting Davis's claim and sent its adjusters to

inspect the crop on multiple occasions during that time period.  For instance, ProAg

adjuster James Martin visited Davis's fields on January 16, 2009, and Martin again

returned to Davis's fields on February 20 with adjuster Lamar Jones.  (Doc. 16-1 at 24).

ProAg completed a Cotton Appraisal Worksheet on March 6, and Martin and Jones

visited Davis's fields again on March 20.  (Doc. 16-1 at 31-32).  ProAg's internal

documentation gives no indication that Davis submitted any late notices or failed to

---

[1] Davis presented a letter from Yearty at the arbitration hearing to verify that the agency
received Davis's notice of loss on December 22, 2008, and to explain that any delay in sending
Davis's notice of law was caused by the agency's misplacement of the notice.  (Docs. 1-1 at 4;
14-3).

submit the necessary documentation.  In fact, a Delayed Notice of Loss / Delayed Claim

Report form dated March 24 reveals that the claim was on time but that the original

adjuster was behind in processing the claim and that Davis established his actual

production history through gin sheets.  (Doc. 12-2 at 1).[2]

On June 12, 2009, Davis received a letter from ProAg's National Claims

Manager, Rob Young.  (Doc. 3-2).  The letter requested additional documentation and

certain information on Davis's irrigation practices to process the claim because "the

current information provided and determinations made would result in [Davis's] claim

being denied."  (Doc. 3-2 at 1).  The letter also stated that Davis's "loss was reported

beyond the time allowed by the policy" but did not elaborate on what deadlines were not

complied with.  (Doc. 3-2 at 1).  Young stated, "we request that you provide the

requested information within 30 day [sic] of the date of this letter" and that ProAg would

be able to make a final determination once Davis submitted the additional information.

(Doc. 3-2 at 3).

On July 21, 2009, Young sent another letter to Davis denying his claim for failure

to comply with the insured's duties and deadlines pursuant to Section 15 of the policy.

(Doc. 3-3 at 1).  Like the June 12 letter, this letter did not explicitly state which deadlines

were not complied with, mentioning only Davis's failure to "respond to [ProAg's] request

for more information."  (Doc. 3-3 at 1).  The letter also noted that ProAg had not

received a response to the June 12 letter or requested documentation from Davis.

(Doc. 3-3 at 1).  Young concluded by directing Davis to submit "any additional

---

[2] The policy requires "a complete harvesting and marketing record" for the insured crop, and gin
sheets are typically used to establish this record for cotton crops.  (Doc. 3-1 at 15; 12 at 4).
Clearly, Davis submitted at least some of the necessary documentation to process his claim.

information you believe to be pertinent to your claim" and stating, "I will be more than happy to review and consider any further information or documentation you believe could have an impact on your claim." (Doc. 3-3 at 2).

Davis continued to compile the requested information and sent a letter to ProAg on November 22, 2009, with attached documentation, but ProAg did not respond to Davis's letter. (Doc. 4 at 6). Davis filed for arbitration of his claim pursuant to the arbitration agreement in the policy, seeking an award of $348,204.50. At the arbitration hearing, ProAg argued its denial of Davis's claim was based on his "failure to submit his claim for indemnity and sufficient supporting information/documentation needed to support his claim within the time period prescribed by the Policy, and within the *extended time period* provided to [Davis] by [ProAg's] letter of June 12, 2009" and stated that Davis's claim could have also been denied on other alleged grounds, including failure to carry out good irrigation practices and engaging in fraudulent conduct by moving his harvested cotton to other farm tracts to increase yield loss. (Doc. 1-1 at 3) (emphasis added).

While the arbitrator found that there was not sufficient evidence to prove Davis engaged in fraudulent conduct, the arbitrator determined that Davis's November 22, 2009, letter was "outside the Policy's timeliness and did not provide all requested and required information/documentation to adjust and complete the claim." (Doc. 1-1 at 5). The arbitrator also stated in his findings that, other than Davis's testimony and Yearty's undated letter, "no documentary evidence was presented or offered" by Davis to prove he submitted the documentation requested in the June 12 letter within the time provided in the letter or to show why he failed to submit the required claim information as stated

in the policy.  (Doc. 1-1 at 5).  Because the arbitrator found that Davis failed to comply with Section 15 of the policy, the arbitrator declined to make any additional factual determinations regarding irrigation practices or the cause of loss.  The arbitrator concluded that Davis failed to meet his burden of proof and denied his claim.

## II.  DISCUSSION

### A.  Motion for Summary Judgment Standard

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  "A factual dispute is genuine only if 'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)).  The burden rests with the moving party to prove that no genuine issue of material fact exists.  *Info. Sys. & Networks Corp.*, 281 F.3d at 1224.  The party may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).

"'If the moving party bears the burden of proof at trial, the moving party must establish all essential elements of the claim or defense in order to obtain summary judgment.'"  *Anthony v. Anthony*, 642 F. Supp. 2d 1366, 1371 (S.D. Fla. 2009) (quoting *Four Parcels*, 941 F.2d at 1438).  The moving party must carry its burden by presenting "credible evidence" affirmatively showing that, "on all the essential elements of its case,

on which it bears the burden of proof at trial, no reasonable jury could find for the non-moving party." *Four Parcels*, 941 F.2d at 1438.  In other words, the moving party's evidence must be so credible, that if not controverted at trial, the party would be entitled to a directed verdict.  *Id.*

"If the moving party makes such an affirmative showing, it is entitled to summary judgment unless the nonmoving party, in response, 'comes[s] forward with significant, probative evidence demonstrating the existence of a triable issue of fact.'" *Id.* (quoting *Chanel, Inc. v. Italian Activewear of Fla., Inc.*, 931 F.2d 1472, 1477 (11th Cir. 1991)) (alteration in original).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. … The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).  Thus, the Court "'can only grant summary judgment if everything in the record demonstrates that no genuine issue of material fact exists.'"  *Strickland v. Norfolk S. Ry. Co.*, 692 F.3d 1151, 1154 (11th Cir. 2012) (quoting *Tippens v. Celotex Corp.*, 805 F.2d 949, 952 (11th Cir. 1992)).

## B.  Grounds to Vacate an Arbitration Award

"There is a presumption under the [Federal Arbitration Act ("FAA")] that arbitration awards will be confirmed, and 'federal courts should defer to an arbitrator's decision whenever possible.'"  *Frazier v. CitiFinancial Corp.*, 604 F.3d 1313, 1321 (11th Cir. 2010) (quoting *B.L. Harbert Int'l, LLC v. Hercules Steel Co.*, 441 F.3d 905, 909 (11th Cir. 2006)).  Section 10 of the FAA permits a federal court in the district where the award was made to vacate an award on four narrow grounds:

(1) where the award was procured by corruption, fraud, or undue means;

(2) where there was evident partiality or corruption in the arbitrators, or either of them;

(3) where the arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or

(4) where the arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made.

9 U.S.C. § 10(a).  Davis argues that the arbitrator imperfectly executed and exceeded the powers granted to him under the crop insurance policy and its arbitration agreement in two respects.  First, Davis asserts that the arbitrator improperly assumed the FCIC's role as interpreter of policy provisions by adding a timeliness requirement that did not appear in the policy.  Second, he asks the Court to vacate the award because the arbitrator did not comply with the rules of the American Arbitration Association ("AAA") incorporated into the policy when he failed to issue an award within the time frame required by the AAA.

ProAg responds by stating that Davis's first argument need not be considered by the Court because Davis failed to meet his burden of proof at arbitration.  If the Court did review the merits of Davis's argument, ProAg continues, the arbitration award should not be vacated because the arbitrator made a factual determination rather than a policy or procedure interpretation.  Furthermore, ProAg asserts that the arbitrator issued the award according to the requirements of the policy and did not violate the AAA's rules.

### C. Davis's Failure to Meet His Burden of Proof at Arbitration

ProAg contends that Davis's argument that the arbitrator improperly engaged in policy interpretation does not need to be addressed because the arbitrator found Davis failed to meet his burden of proof at arbitration based upon the evidence presented. ProAg's argument is without merit.

First, it is apparent that the arbitrator did not rule on the merits of Davis's claim. The arbitrator explicitly stated that Davis's failure to comply with the deadlines in the policy was "reason and justification" for ProAg to deny his claim and "having made these factual determinations, it is not necessary to make any additional factual determinations" on issues related to the substantive merits of Davis's claim. (Doc. 1-1 at 5). While the arbitrator may have said that Davis "failed to meet his burden of proof based upon the evidence presented," clearly, the arbitrator only reviewed the evidence to determine whether Davis submitted the information ProAg requested in a timely manner. (Doc. 1-1 at 5).

### D. Effect of the Arbitrator Engaging in Policy Interpretation

Davis's crop insurance policy is governed by the Federal Crop Insurance Act ("FCIA"), and the terms and provisions of federal crop insurance policies are established by the Federal Crop Insurance Corporation ("FCIC"). The FCIC is operated and managed by the Risk Management Agency ("RMA"). The RMA, through the FCIC, issues Final Agency Determinations ("FADs") interpreting the FCIA and regulations made under the FCIA. These determinations are final and binding on all participants in the federal crop insurance program. 7 C.F.R. § 400.765(c).

The Basic Provisions of policies governed by the FCIC, including the policy in this case, broadly requires the parties to obtain an interpretation from the FCIC if a dispute in arbitration "in any way involves a policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure." (Doc. 3-1 at 22). Policy or procedure interpretations obtained from the FCIC are binding in arbitration, and the failure to obtain a required interpretation from the FCIC results in the nullification of any arbitration agreement or award. (Doc. 3-1 at 22).

The June 12 letter sent by ProAg's National Claims Manager, Rob Young, is at the center of the dispute as to whether the arbitrator engaged in policy interpretation. Davis believes that the June 12 letter was the first request for additional information not explicitly required under Section 15 of the policy. Davis also argues that the policy does not provide a deadline for an insured's response to a first time request for additional information and that the letter suggested, but did not mandate, a 30-day deadline. Therefore, Davis concludes, the arbitrator engaged in policy or procedure interpretation by determining the meaning or applicability of the timeliness requirements found in Section 15 of the policy and by adding a requirement not found in the policy.[3]

ProAg, on the other hand, characterizes the June 12 letter as a generous extension to submit information required as part of the claim for indemnity that Davis should have filed within 60 days of the harvest price's release. Because Davis failed to comply with the 60-day deadline, ProAg contends that the arbitrator's decision that

---

[3] Davis points to the arbitrator's finding that Davis did not submit "the required information/documentation requested in [ProAg's] June 12, 2009 letter *within the time provided by [ProAg]*" to show that the arbitrator's decision, at least in part, rested on Davis's failure to comply with the deadline found in the June 12 letter. (Doc. 1-1 at 5) (emphasis added).

Davis did not meet the policy's timeliness requirement or the extended deadline in the letter was merely a factual determination and not a policy or procedure interpretation. Essentially, ProAg argues that Davis's claim was already late and denial would have been appropriate prior to giving him an extension, so the arbitrator could not have engaged in policy interpretation for finding Davis's claim untimely based on his failure to comply with an extension ProAg was under no duty to give.

Section 15 of the policy's Basic Provisions outlines the insured's duties in the event of a loss to establish a claim for indemnity.  The only explicit timeliness requirements relevant to Davis's claim for submitting notices or documentation found in Section 15 are: (1) provide notice within 72 hours of the initial discovery of damage but not later than 15 days after the end of the insurance period; (2) provide notice of expected revenue loss not later than 45 days after the harvest price is released; and (3) submit a claim for indemnity declaring the amount of loss not later than 60 days after the harvest price is released unless the parties agree to an extension.[4]  (Doc. 3-1 at 15).

In addition to the timeliness requirements, Section 15(a)(4)(iii) requires the insured to "[c]ooperate with us in the investigation or settlement of the claim, and, as often as [ProAg] reasonably require[s] … [p]rovide us with records and documents we request."  (Doc. 3-1 at 15).  Section 15(c) further advises the insured that the "claim for indemnity must include all information [ProAg] require[s] to settle the claim" and failure to submit the required information with the claim will result in the claim being denied. (Doc. 3-1 at 15).  Section 15(d)(1) requires the insured to submit "a complete harvesting and marketing record" of the crop, and Section 5(e) requires the insured to establish the

---

[4] These provisions are found at 15(a)(2), 15(a)(5), and 15(c), respectively.

total production or value received on the crop, that the loss occurred during the

insurance period, and the loss was "directly caused by one or more of the insured

causes." (Doc. 3-1 at 15-16).  Section 15(h) places the burden of proof on the insured

to show that he has "complied with all provisions of this policy." (Doc. 3-1 at 16).

Section 15 does not provide a deadline for ProAg's requests for additional information.

The Court has found no Eleventh Circuit authority, nor any authority in other

circuits, to resolve whether the arbitrator's decision to deny indemnity for Davis's failure

to comply with Section 15's provisions was a factual determination or a policy

interpretation.  ProAg cites *Great American Insurance Co. v. Moye*, 733 F. Supp. 2d

1298 (M.D. Fla. 2010), to support its contention that a FCIC interpretation is

inappropriate and inefficient when the meaning of a provision is clear and an arbitrator

need only determine whether the facts at hand fall within an already defined meaning.

*Id.* at 1305-06.  The court in *Moye* noted three ways in which a policy or procedure

would need FCIC interpretation: whether it is applicable, how it is applicable, and its

meaning.  *Id.* at 1305.  Finding whether the term "otherwise properly treated" was

applicable or how it was applicable was not in dispute, the court found no FCIC

interpretation was needed because the Federal Register already contained commentary

on the term that established its meaning.[5]  *Id.*  While obtaining a FCIC interpretation

when the applicability or meaning of a term or provision is not in dispute may be

---

[5] As later discussed, the Court can find no, and the Parties have not pointed to any, FADs that
squarely address the situation before the Court.  Even if pertinent commentary exists, however,
a FCIC interpretation may still be required to address "the unique situation presented."  *See
Garnett v. NAU Country Ins. Co.*, 2009 WL 3644762, at *3 (W.D. Ky.) (finding that a previous
FCIC interpretation that the insured must establish a fire's source was a natural cause or
disaster did not give enough guidance to the arbitrator to resolve the facts at hand and,
therefore, a FCIC interpretation was necessary).

inefficient, the Court cannot find the applicability of Section 15 to the June 12 letter to be as straightforward as ProAg argues.

While the FCIC has regularly addressed the precise language in dispute in this case,[6] a review of the FCIC's FADs did not reveal any interpretations addressing the unique situation before the Court.  A few FADs, however, do indicate that a FCIC interpretation was needed in this case because the FCIC has issued interpretations discussing the reasonableness of an insurance provider's deadlines.  *See* FAD-87 (Mar. 27, 2008) (stating that an insurance provider has "discretion to impose a reasonable deadline for an insured to provide documentation when requested" but that the insurance provider cannot set the deadline more than 60 days after the end of the insurance period); FAD-056 (Dec. 19, 2005) (finding that an insurance provider has the right to request records to support production history but noting, "without a specific provision in the [FCIA], the applicable regulations or policy stating that once the audit is complete the reported yield cannot be further adjusted, it would be arbitrary and capricious" to refuse to consider the insured's additional records because they are delayed when there are "legitimate reasons" for the delay).

What complicates the issue of whether a FCIC interpretation was required here is the fact that the arbitration award does not explicitly disclose the arbitrator's findings. The arbitrator did not find that Davis failed to comply with the 72-hour requirement for submitting the initial notice of loss.[7]  Nor did the arbitrator expressly conclude that Davis

---

[6] *See, e.g.*, FAD-177 (Dec. 18, 2012); FAD-176 (Dec. 10, 2012); FAD-97 (Dec. 3, 2008).

[7] The arbitrator did state that Davis could not use "lack of knowledge or the deficiencies of his Local Agent as an excuse." (Doc. 1-1 at 5).  There is no evidence in the record to suggest that Davis did not provide notice to his local agent within 72 hours of the initial discovery of damage. In fact, Davis complied with the policy by providing notice to his local agent pursuant to Section

failed to submit his expected revenue loss within the 45-day deadline or his claim for

indemnity within the 60-day deadline.  Rather, the arbitrator simply stated that Davis

"clearly failed to comply with the Policy provisions and terms as it relates to his duties

and responsibilities to provide information/documentation for his claim *per Section 15* of

the Policy." (Doc. 1-1 at 5) (emphasis added).  The only deadline that the arbitrator

explicitly found to be disregarded was the 30-day deadline found in the June 12 letter.[8]

This finding raises the question of whether the arbitrator concluded that ProAg could set

deadlines not found in the policy and then use those deadlines as a basis for denial of a

claim for procedural noncompliance.  While it is unclear precisely how the arbitrator

interpreted the letter, it is clear that he interpreted the letter as a procedural requirement

regarding Davis's proof of his claim.

If the arbitrator had found that Davis did not produce sufficient evidence to

substantiate his claim, then this review of the facts would have been within the purview

of the arbitrator.  In fact, the award suggests that there were some issues with the

sufficiency of the evidence.  However, the arbitrator never made a finding that the

information submitted to ProAg was insufficient, but found instead that Davis did not

submit what the insurance company requested within the policy's and the letter's

deadlines.  The timeliness issue decided by the arbitrator was the type of matter

---

15(g).  It is not clear what the arbitrator meant by this statement or whether the arbitrator
believed that oral notice to Davis's local agent was insufficient notice under the policy but, in any
event, he did not explicitly base the denial of Davis's claim on this ground.

[8] Given ProAg's continued adjustment of Davis's claim after the 60-day deadline for submission
of an indemnity claim without any indication in its internal documentation that the claim was
untimely, it seems apparent that ProAg's final decision to deny the claim was based on Davis's
failure to submit documentation requested in the June 12 letter and not on Section 15's notice
provisions.

reserved for interpretation by the FCIC.  The arbitrator clearly interpreted the language of Section 15 to arrive at a conclusion that failure to comply with the deadline in the June 12 letter could result in denial of the claim and, in so doing, made a "policy or procedure interpretation, regarding whether a specific policy provision or procedure is applicable to the situation, how it is applicable, or the meaning of any policy provision or procedure." (Doc. 3-1 at 22).  Because the failure to obtain a required interpretation from the FCIC results in the nullification of an arbitration award, the arbitration award is subject to vacatur on this ground.

### E.  Effect of Issuing the Award Outside of the AAA's Rules' Deadline

Davis also argues that the arbitration award should be vacated because the arbitrator failed to conduct the hearing pursuant to Section 20 of the policy's Basic Provisions, which requires hearings to be conducted "in accordance with the rules of the American Arbitration Association." (Doc. 3-1 at 22).  Specifically, Rule 41 of the AAA's Arbitration Rules mandates that an award be made no later than 30 days after the close of the hearing.  Because the hearing was closed on November 11, 2011, and the arbitrator did not issue the award until December 15, 2011, Davis contends that the arbitrator exceeded his authority by making the award outside of the time frame provided by the arbitration agreement.  ProAg responds by noting that Section 20(c)[9] of the policy overrides Rule 41 by making any decision in arbitration binding, not just those

---

[9] The policy requires any disagreement to be "resolved through arbitration in accordance with the rules of the [AAA], except as provided in sections 20(c) and 20(f)." (Doc. 3-1 at 21).  Section 20(c) provides, "[a]ny decision rendered in arbitration is binding on you and us unless judicial review is sought." (Doc. 3-1 at 22).  Section 20(f) provides, "[i]f there are conflicts between any rules of the AAA and the provisions of your policy, the provisions of your policy will control." (Doc. 3-1 at 22).

decisions "issued strictly within 30 days of the close of the hearing."  (Doc. 9 at 12).

Even if Rule 41 was applicable, ProAg contends that a violation of the Rule by issuing

an award three days outside of the time frame does not satisfy one of the four grounds

for vacating an award.

ProAg's first argument is incorrect.  The AAA rules are incorporated into the

policy by reference, and no policy provision conflicts with Rule 41.  *See* FAD-126 (Nov.

2, 2010) (requiring the policyholder to file the demand for arbitration in accordance with

the AAA's Rules because no exception was provided for in the policy for that rule).

Accordingly, the arbitrator was required to issue an award within 30 days of the close of

the hearing.

While there is no clear Eleventh Circuit authority on whether an arbitration award

issued outside of the Rule 41 requirement is rendered invalid, this circuit has held that

waiting to challenge the untimeliness of an arbitration award can result in a waiver and

was less inclined to vacate an award issued shortly after the deadline.  *Lodge No. 725,*

*Int'l Ass'n of Machinists v. Mooney Aircraft, Inc.*, 410 F.2d 681, 683 (5th Cir. 1969)

("[W]e would be extremely loath to penalize the beneficiary of the award because of the

lapse of time over which he had no possible control.  This is especially true because of

the extreme shortness of the period. … It is unthinkable that such an award would be

set aside because of a loss of jurisdiction to act one day later than the three days

mentioned in the contract.").[10]

It appears that courts in other circuits are also reluctant to strike down untimely

arbitration awards as long as they are issued within a reasonable time period, no harm

---

[10] The Eleventh Circuit has adopted as binding all decisions of the former Fifth Circuit rendered
prior to October 1, 1981. *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981).

or prejudice results from the late award, or the parties waived their objections by failing to earlier challenge the late award. *See Jones v. St. Louis-San Francisco Ry. Co.*, 728 F.2d 257, 265 (6th Cir. 1984) (stating parties should use "unequivocal language" in the policy that an arbitrator rendering a late award loses his jurisdiction and that, otherwise, an award is only invalid if issued beyond a reasonable time); *Svoboda v. Negey Assocs., Inc.*, 655 F. Supp. 1329, 1332 (S.D.N.Y. 1987) (citing *West Rock Lodge No. 2120 v. Geometric Tool Co.*, 406 F.2d 284, 286 (2nd Cir. 1968)) (finding that the right to challenge an arbitration award rendered one day late was waived for failure to object to its timeliness prior to delivery of the award or upon its rendition and that the award could not be vacated for untimeliness because no prejudice from the late award was established).

Davis has not alleged that he objected to the arbitrator's untimely decision prior to its rendition nor has he alleged that any harm or prejudice resulted solely from the award's untimeliness. Accordingly, the Court finds that the arbitration award is not subject to vacatur on this ground.

### III. CONCLUSION

For the foregoing reasons, Davis's Motion to Vacate Arbitration Award and Motion for Summary Judgment are **GRANTED**. The Parties are ordered to obtain a policy interpretation from the FCIC. If there remains arbitrable issues after the FCIC renders its interpretation, pursuant to 9 U.S.C. § 10(b), the Court directs a rehearing by an arbitrator in accordance with the Parties arbitration agreement.

**SO ORDERED**, this the 8th day of January, 2013.

<u>S/ Marc T. Treadwell</u>
MARC T. TREADWELL, JUDGE
UNITED STATES DISTRICT COURT